## WESTERN & SOUTHERN LIFE INS CO v KENNETT

Ohio Appeals, 2nd Dist, Montgomery Co

No 1199. Decided June 30, 1933

James & Coolidge, Dayton, for plaintiff in error.

R. N. Brumbaugh, Dayton, for defendant in error.

**OPINION**

By HORNBECK, PJ.

We are satisfied that Kennett could well have been in the course of his employment with his company at the time of the collision and his death, though he was not preparing to call on any policy holder named in the Childress or Byrkett debit. It seems reasonably certain that though the company did not encourage it would countenance the writing of business by agents and assistant superintendents in territory outside of their debit. It definitely appears from four sources that Kennett had purposed to work for his company with Childress on the afternoon of December 1st.

If Kennett and Childress were at the Gibson home 20 minutes before the accident which resulted in their death, they are, at that time, clearly shown to have been carrying on the business of their company.

The testimony of the Hampton boy and Mrs. Gibson is attacked. There is no question but that there are discrepancies in their statements. All that both say cannot be true. But it was well within the province of the trial court to believe that upon the major proposition, namely, whether or not Kennett and Childress had been at Mrs. Gibson's home soliciting insurance on December 1, 1927, the witnesses were to be believed. The occurrences to which the

Hampton boy testified, by their nature must have made a lasting and marked impression on his mind. It is well within the probabilities that he knew that the two men that he saw on Mrs. Gibson's porch one of whom she wished would break his neck, were the two men whom he soon afterwards saw dead at the railroad crossing, although he may have been mistaken in some of the minor details to which he testified. It is urged that suggestion may have operated to cause him to say that the men killed were the men he saw on Mrs. Gibson's porch. However, his statement, if true, discountenances that conclusion. He asserts that nothing was said about the men being insurance men when he first saw them at the railroad crossing, but that this statement was made upon his second visit to the scene of the accident. His identification is questioned because in an interview with the Hampton boy conducted by Elmer L. Keeler and Elvie Smith for the company at a school house in the presence of Bessie A. Weaver, principal of the Whittier school, Hampton said that Smith was one of the men that he saw on Mrs. Gibson's porch. The strength of this contradictory admission of Hampton is materially weakened by the statement of his principal, Miss Weaver, that the boy was confused by continued, persistent and suggestive questions of Mr. Keeler; that he was not treated fairly and was pressed unduly and that by a series of queries was adroitly lead to make a contradictory statement. This conduct is denied by Messrs. Keeler and Smith.

Affidavits of William L. Harris and Roscoe Lehman, agents for the Prudential Insurance Company, appear in the record. They say that they drove in an automobile in front of the home of Mrs. Gibson; that Mr. Harris went in to make collection. Both state that the calls were made on December 1st and 2nd, 1927. This testimony was before the trial court and was considered in its effect on the statements of Hampton and Mrs. Gibson.

It is urged that if Harris and Lehman are correct in their assertions Mrs. Gibson and Hampton must be mistaken. We do not believe this conclusion must be drawn.

A number of insurance companies write policies on the plan followed by plaintiff in error. Mrs. Gibson puts it "There is always an insurance man. They come in bunches." Mrs. Gibson worked through the night, slept in the morning and did not arise until noon. She states positively that the men whom she identified as being at

her home when the Hampton boy was there were not Harris and Lehman.

Several things are significant in their affidavits. Neither attempts to fix the time of day—forenoon or afternoon—that they called at the Gibson home.

Neither says that he saw Mrs. Gibson when they called on Thursday, the 1st of December. Lehman says there was no one on the porch but that a woman came to the door in answer to a rap of Harris; that he does not know if it was Mrs. Gibson as at the time of the call or at the time of making the affidavit he did not know her. Neither mentions the Hampton boy although the trial court had ample reason to believe that he was on the porch at the time the two men called on Mrs. Gibson on Thursday.

Harris in one of his affidavits discloses the indistinctness of his recollection—"he believes he called at Mrs. Gibson's home." "Though he has no distinct, independent recollection of being there on Dec. 1st." In a later affidavit he seems certain of his facts.

It is probable that the trial court under all the circumstances chose to believe the positive identification of Kennett and Childress by the Hampton boy and the corroboration of Mrs. Gibson. This, of course, clearly it was his right to do.

There is no direct and positive testimony and in the very nature of things it would be almost impossible to produce to the effect that Kennett was in the course of his employment when he was crossing the B. & O. railroad on Weaver St. when killed. One witness says that immediately prior to their going on to the railroad track Kennett and Childress were seen to be looking down as though they might be examining papers. But 20 minutes before the collision, the evidence, if true, established that Kennett was in the course of his employment, carrying on the business of his employer. In the absence of something tending to show a diversion from this course of employment, we believe the presumption of continuance of status up to the time of the accident would be justified.

The accident occurred at 2:34 P. M. and the appointment of Kennett with Quigley at 3 or 3:30 P. M. in another part of the city is called to our attention as proof that Kennett was going the wrong direction to keep his appointment. He had almost an hour in which to complete whatever work he was doing and meet Quigley. Traveling in an automobile, much territory could be covered. The fact that Kennett and Childress had a few minutes before their death passed the B. & O. crossing on Weaver Street, moving east, turned about and started west, is cited as further indication that they were not within the scope of their employment when they were struck by the train, but the probability was that they were on their way back to the Dubb's house where Quigley had seen them. Just why they turned and went west will never be certainly known. They could have been returning to check the Sheet's policy before meeting Quigley. The fact that it was a small premium and isolated from the bulk of Byrkett's policies argues as much for the return to check it as against this purpose.

That these men were drinking or that they had purchased any liquor at the Dubb's house or that they were returning to the Dubb's house is conjecture of the most uncertain type. If they had been in the Dubb's house and had purchased liquor, it was but a temporary variation from what seems to have been the regular course of their employment. The statement of Quigley, the only suggestion in the record from which any inference whatever can be drawn that Kennett was drinking, is too vague to be convincing. The finding of the broken bottle of liquor on Kennett's person is a disquieting circumstance but there is so little to connect it with the movements of Kennett as to give it any considerable probative force.

The trial court, acting as a jury, had a right to draw all reasonable inferences from the facts proven and we can not say that the conclusion drawn on the controlling issue was so manifestly against the weight of the evidence as to require us to set it aside.

We are cited to **Industrial Commission v Davis, 119 Oh St, 221**, and **Industrial Commission v Lewis, 125 Oh St, 296**, on the proposition that under the facts of this case the law is established that Kennett could not be found to have been engaged in the course of his employment at the time of his death.

In the Davis case it appeared that Davis was a janitor who died from heart disease. Among other duties he was required to take care of the furnace and to shovel coal thereto. Obviously, this was only required intermittently and there was no direct nor inferential evidence in the record that he was shovelling coal at the time of the attack from which he died. Although the case is decided on the broad proposition that there was no evidence tending to show

that his death was caused by an injury sustained in the course of his employment, most of the opinion is devoted to the claim that there was no evidence of any overstrain or unusual exertion of any kind by Davis prior to his death, nor anything from which such inference could properly be drawn.

In the Lewis case there was no evidence that Lewis, who was a collector and was being driven in an automobile owned by a neighbor at any time during his trip had entered upon the performance of the duties of his employer although there was proof that he meant to make collections the evening that he was killed. The court epitomizes its conclusions of fact in this language at page 299:

"However, there is no evidence whatever in the record, and no fact from which any possible inference can be drawn which indicates that there was any debtor of Lewis' employer in the vicinity where he was driving, or in the direction which he was traveling when struck, or anywhere between that location and his own home."

The difference in permissible inferences in the Lewis case and the instant case is apparent.

Another ground of error is presented and discussed by counsel.

"That the injuries which caused the death of defendant in error's decedent, did not arise out of his employment, but were injuries resulting from a risk to which all persons were exposed."

Under the stipulation heretofore quoted we do not believe this question is before the court for determination.

If it were, we would be required to hold that the court could properly have found that the use of an automobile by Kennett in carrying on the business of his employer was necessary, customary and proper, recognized and approved by the employer and while engaged in the course of his employment the hazard of a railroad crossing on a public street as a matter of law arose out of his employment.

Authorities supporting our position will be found in annotations to Chandler v Industrial Commission of Utah, 8 A.L.R., 935; Katz v Kadens & Co., 23 A.L.R., 319; Derleth et v Roach and Sieber Co., 36 A.L.R., 474; **Re Colarullo, 51 A.L.R., 509, 22 OLR, 419.**

We are not passing upon this record as

upon original hearing but on error and must view the judgment of the trial court to determine whether or not it is manifestly against the weight of the evidence and so contrary thereto as to shock the conscience of this court. In our judgment there is no particular difficulty in the law of this case but it is found in the facts and their proper determination. Therefore our extended discussion of facts and particularly those upon which the trial court could have based the judgment. The burden of proving that plaintiff's decedent was in the course of his employment at the time of his injury and death was upon the plaintiff. The facts which the trial court had a right to find were proven permitted the logical inference that Kennett was in the course of his employment when he was killed. The judgment of the trial court will therefore be affirmed.

KUNKLE and BARNES, JJ, concur.